Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 21 2014, 10:15 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**MARK A. DELGADO**
**KEVIN R. LESLIE**
Monticello, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**AARON J. SPOLARICH**
Deputy Attorneys General
Indianapolis, Indiana

**ALEXANDRA D. A.THOMAS**
White County Department of Child Services
Monticello, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: N.I., the minor child, and K.I., the mother, )<br><br>K.I., )<br><br>Appellant-Respondent, )<br><br>vs. )<br><br>THE INDIANA DEPARTMENT OF CHILD SERVICES, )<br><br>Appellee-Petitioner. ) | No. 91A04-1305-JT-244 |

APPEAL FROM THE WHITE CIRCUIT COURT
The Honorable Robert W. Thacker, Judge
Cause No. 91C01-1212-JT-3

**January 21, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

K.I. ("Mother") appeals from the involuntary termination of her parental rights to N.I. ("the Child"). In so doing, Mother contends that the juvenile court's judgment is not supported by clear and convincing evidence.

We affirm.

## FACTS AND PROCEDURAL HISTORY

The facts most favorable to the juvenile court's decision reveal that Mother conceived the Child when she was thirteen years old and gave birth to the Child out of wedlock on October 30, 2009 when Mother was fourteen years old. Initially, Mother identified a male over the age of twenty as the Child's father, but later identified C.C., whose whereabouts were unknown, as the putative father. In late January 2010, when the Child was four months old and Mother was fourteen years old, the Child's maternal grandmother, who cared for Mother, was arrested and taken into custody. Mother's grandparents planned to provide care for Mother, but Mother "basically [ ] ended up at" another relative's home. *Tr*. at 190. That relative, S.D., was Mother's aunt.

Mother ran away from S.D.'s house without arranging for the Child's care. Law enforcement took Mother into custody in Lafayette, Indiana, when Mother contacted law enforcement for assistance in attempting to regain physical custody of the Child. Law enforcement officers ultimately placed Mother at the Kinsey Youth Center[1] in Kokomo. The White County Department of Child Services ("WCDCS") removed the Child from

---

[1] "The Howard Circuit Court, Robert J. Kinsey Youth Center is established to provide Short-Term Secure, Non-Secure Emergency Shelter Care, and Long-Term Residential Care for juveniles who are ordered detained or sheltered by the court through wardships."
(http://co.howard.in.us/kinsey/missionfp.htm) (last visited Dec. 13, 2013).

Mother's care on February 11, 2010, when the Child was four months old. The Child remained in the care of S.D. until March 2010.

On March 1, 2010, Mother admitted that the Child was a child in need of services ("CHINS") due to her inability to provide stable living conditions and appropriate care for the Child, and the juvenile court adjudicated the Child as such the same day. A dispositional hearing was held on April 5, 2010, and the order entered as a result of that hearing provided that Mother: (1) refrain from using, possessing, and selling illegal drugs; (2) abide by all terms of her probation; (3) complete a parenting assessment and follow all recommendations; (4) visit with the Child as arranged by WCDCS; (5) participate in parenting classes as arranged by WCDCS; and (6) attend counseling as arranged by WCDCS. The Child was placed in the home of relative foster parents, cousins of Mother, B.M. ("foster father") and M.M. ("foster mother"), when the Child was fifteen months old and cared for the Child for the following twenty-three months thereafter.

Mother participated in services following the entry of the dispositional order, but tested positive on multiple drug screens from April of 2010 through March of 2011, including: (1) a July 12, 2010 positive marijuana screen; (2) an August 11, 2010 positive screen for marijuana and amphetamines; (3) a February 17, 2011 positive screen for marijuana; and (4) a March 25, 2011 positive screen for marijuana and amphetamines. More specifically, with respect to the August 11, 2010 positive drug screen, service providers discovered that Mother took "some blue pill," leading to an ambulance transporting Mother to the hospital.

On April 18, 2011, WCDCS petitioned to terminate Mother's parental rights to the

Child. The juvenile court held an evidentiary hearing on the petition on July 22, 2011. During the interim between the hearing and the issuance of the order, Mother ran away from home on September 16, 2011 and on October 4, 2011. WCDCS learned in September 2011 that Mother had gotten pregnant twice since the Child's birth, with the second pregnancy fathered by a man over twenty years old.

The juvenile court denied the termination petition on October 6, 2011. The juvenile court's order included the finding that this case presented special circumstances because of the following: (1) Mother's young age; (2) Mother's probable status as a CHINS herself although never having been adjudicated as such; and (3) the good intentions of Mother and the Child's maternal grandmother, neither of whom possess the common sense, understanding, or financial means to follow through with items set forth in the case plan. *WCDCS Ex.* 1 at 200-03. The juvenile court noted that Mother had exhibited signs of progress which had not yet fully culminated.

After the termination proceedings, WCDCS scheduled a meeting to discuss how to proceed with managing Mother's case. Although the Child's maternal grandmother was present, Mother failed to attend. Maternal grandmother informed WCDCS that Mother was missing. After that meeting in October 2011, WCDCS filed a petition alleging that Mother was a CHINS.

The juvenile court adjudicated Mother a CHINS, and as part of Mother's dispositional order, Mother was placed at Promising Futures, a group home for teenage mothers. On March 19, 2012, while Mother, who was sixteen years old at the time, resided at Promising Futures, she gave birth to another child, B.I. Mother initially identified C.B.

4

as B.I.'s father, but later identified D.A., who was over twenty years old and had a history of substance abuse, as B.I.'s father. Mother left Promising Futures in June of 2012. Mother has resided with the Child's maternal grandmother since that time.

After Mother left Promising Futures, Marla Rausch ("Rausch"), a home-based family case manager and therapist for Life Line Youth and Family Services, began providing in-home services to Mother. Rausch was concerned with Mother's inability to attend appointments due to scheduling other appointments at the same time. Mother would wait until the last minute to inform Rausch of the scheduling conflicts. Mother, however, made some progress with that issue in the fall of 2012 after Rausch informed her of the seriousness of the situation and that her services could be terminated.

Rausch was also concerned about Mother's environment and prior substance abuse. Rausch stated that Mother did not begin to take her situation seriously until WCDCS filed its second petition for the termination of Mother's parental rights to the Child. Rausch observed that, after that time, Mother made adjustments for herself and for B.I. Rausch believed that if Mother could take care of B.I. then she could probably take care of the Child.

Mother also expressed her belief that if she could care for B.I., she could also care for the Child. However, Mother stated that, during visitation, the Child "just throws fits all the time . . . if I tell her no, then she freaks out." *Tr.* at 97. The Child would tell Mother that, while at her foster home, her foster mother would allow her to do certain things Mother was attempting to prohibit, and Mother would respond by saying "Well, you're at my house, I don't care." *Id.* A service provider who was supervising visitation in the summer

of 2012 was concerned with the way Mother would speak to the Child. One example of such difficulty in communication occurred when the Child was crying. Mother would tell the Child "that she was being annoying and she was being a big baby." *Id*. at 155.

On September 29, 2012, Mother was staying at her sister's house with B.I. Mother's sister, A.P., was on probation for an alcohol-related offense, and Mother had previously had to call 911 when A.P. arrived at the Child's maternal grandmother's home intoxicated. Mother acknowledged that A.P. has a problem with alcohol, but "didn't think that it was like a problem." *Id*. at 66. At approximately 2:00 a.m. on that date, Mother was sitting on a couch in the living room of A.P.'s home with B.I. sleeping next to her. Mother earlier had consumed a shot of vodka and a chaser. A.P. went into her bedroom where her husband was sleeping. Mother did not know what had occurred in the bedroom, but A.P.'s husband chased A.P. with a long, tall fan hitting A.P. Mother then saw A.P. go into the kitchen and retrieve a knife. As Mother was leaving the house with B.I., A.P. was stabbing the bedroom door with the knife.

Mother walked to her grandfather's house, which was nearby, and called B.I.'s father, D.A., to give her a ride somewhere else. D.A. came to the house even though Mother had a protective order entered against D.A. When questioned about the events of the evening later, Mother denied that at age sixteen she had consumed vodka on that evening. When WCDCS Family Case Manager Gretchen Reed ("FCM Reed") confronted Mother with the fact that the drug screen would reveal the presence of alcohol in Mother's system, Mother nonetheless continued to deny that she had consumed alcohol.

On November 30, 2012, the juvenile court agreed with WCDCS's request to change

6

the permanency plan to having the Child's current relative foster placement become the adoptive placement of the Child. The relative foster parents were in a position to adopt the Child, and planned to continue to facilitate a relationship between Mother and the Child even if Mother's parental rights to the Child were terminated. Foster mother described Mother's relationship with the Child as one of big sister and little sister, and the Child's relationship with maternal grandmother as one with a friend.

Guardian Ad Litem Rebecca Trent ("GAL Trent") had concerns about the following: (1) Mother's lack of relationship with the Child and that Mother's parenting was the result of the overflow of feeling from her relationship with B.I.; (2) Mother's multiple dishonest statements to WCDCS; (3) Mother's failure to recognize that caring for two children is more difficult than caring for only one child; (4) Mother's continued deceptive behavior when she is close to reunification with the Child; and (5) Mother's taking a possessory interest in the Child instead of forming a parent-child bond. FCM Reed believed that the termination of Mother's parental rights was in the best interest of the Child. FCM Reed also believed that Mother's continued dishonesty about her activities was a concern as they neared trial home visitation and reunification.

On March 12, 2013, the juvenile court held an evidentiary hearing on WCDCS's second petition to terminate Mother's parental rights to the Child. After taking the matter under advisement, the juvenile court entered its order terminating Mother's parental rights. Mother now appeals from that order.[2]

---

[2] C.C., the Child's putative father, was not located and his parental rights, if any, were not terminated.

7

## DISCUSSION AND DECISION

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, in terminating Mother's parental rights, the juvenile court entered specific findings and conclusions. When a juvenile court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however,

8

are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *In re K.S.*, 750 N.E.2d at 836.

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

(B)    that one (1) of the following is true:

    (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)    that termination is in the best interests of the child; and

(D)    that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the juvenile court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis supplied).

9

At the outset, we observe that Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *See e.g. In re L.S.*, 717 N.E.2d at 209. Although we need only address one of the three requirements, we will address each of the requirements that are challenged by Mother.

When making such a determination, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The trial court may also consider any services offered to the parent by the county department of child services, here WCDCS, and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Moreover, the WCDCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *See In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

We note that, in the present case, Mother does not challenge the juvenile court's

legal conclusions vis-à-vis the following statutory elements: (1) the Child has been removed from Mother's care for the requisite period of time; (2) that continuation of the parent-child relationship poses a threat to the Child's well-being; (3) that termination of Mother's parental rights is in the best interests of the Child; and (4) that there is a satisfactory plan for the care and treatment of the Child through relative adoption. We conclude that notwithstanding Mother's apparent waiver of arguments as to those elements, the record supports the juvenile court's conclusions.

Further, since Indiana Code section 31-35-2-4(b)(2)(B) requires proof of only one of the following statutory elements--(1) the reasonable probability that the conditions resulting in the Child's removal or placement outside of the home will not be remedied, or (2) there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the wellbeing of the Child--and Mother challenges only the former, she has, in fact, conceded that the State has proven the latter element by clear and convincing evidence. That alone would support the juvenile court's decision to terminate Mother's parental rights to the Child. Notwithstanding Mother's waiver of the argument with respect to the former element, the record supports the juvenile court's decision.

We observe that Mother has not challenged the juvenile court's findings of fact; thus, they stand as proven. A party waives a challenge to the sufficiency of the evidence supporting the trial court's findings when the party does not provide any argument relating to the sufficiency of the findings of the trial court on appeal. *City of Whiting v. City of E. Chicago*, 266 Ind. 12, 19, 359 N.E.2d 536, 540 (1977).

Even so, the record in this matter supports the juvenile court's findings. WCDCS

11

presented clear and convincing evidence that Mother would not remedy the conditions that resulted in the Child's removal and/or the reasons for the continued placement of the Child outside of the home. Mother argues that WCDCS's failure to "never establish [] a goal of reunification of [the Child] and [Mother] whereby specific skills or milestones were established to achieve that end state" demonstrates a "dramatic failure on the part of 'the system' established by [WCDCS]." *Appellant's Br*. at 9. Mother contends that "[o]ne night of poor judgment in which no one was harmed or even arrested should not discount those strides she made to both improve and prove to [WCDCS] her abilities as a parent[,]" does not support a termination of her parental rights to the Child. *Id*. at 11.

The record is replete with testimony from Rausch, FCM Reed, and Twyla Gould, a Lifeline employee who provided case management services to assist Mother, that they were initially requested to work on reunification of Mother with the Child as that was the initial goal, and that WCDCS was moving toward trial home visitation. Furthermore, we have stated the following:

> The [juvenile] court can reasonably consider the services offered by the [WCDCS] to the parent and the parent's response to those services. However, the law concerning termination of parental rights does not require the [WCDCS] to offer services to the parent to correct the deficiencies in childcare. . . . Rather, while a participation plan serves as a useful tool in assisting parents in meeting their obligations, and while county departments of public welfare routinely offer services to assist parents in regaining custody of their children, termination of parental rights may occur independently of them, as long as the elements of Ind. Code § 31-35-2-4 are proven by clear and convincing evidence. Therefore, a parent may not sit idly by without asserting a need or desire for services and then successfully argue that he was denied services to assist him with his parenting.

*In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000) (internal citations omitted).

Additionally, the statute does not contain a requirement that specific skills or

milestones be provided by the WCDCS, or other such similar agency, in order for reunification to be achieved. "[T]he provision of family services is not a requisite element of our parental rights termination statute." *In re I.A.*, 934 N.E.2d 1127, 1136 (Ind. 2010) (quoting *In re E.E.*, 736 N.E.2d 791, 796 (Ind. Ct. App. 2000)). Thus, a challenge of the sufficiency or reasonableness of services offered to a parent is not properly brought in an appeal from the termination of parental rights.

Although Mother's challenge of the juvenile court's decision to terminate her parental rights is couched in terms of "one night of poor judgment," *Appellant's Br.* at 11, referring to the September 2012 incident at A.P.'s house, the juvenile court chose to cast a wider net, and considered Mother's habitual patterns of conduct. We have recited her continued difficulty with substance abuse, including an instance where service providers requested that Mother be transported by ambulance to a hospital after ingesting an unknown blue pill. Mother twice ran away from home, and after the first termination petition was denied, Mother failed to attend the family team meeting to discuss how her case should progress. Mother also continued to engage in inappropriate sexual relationships with older men resulting in two additional pregnancies subsequent to the birth of the Child. Mother minimized the severity of her sister's abuse of alcohol, even though she was aware that A.P. was on probation for an alcohol-related offense, and Mother, who was underage, consumed vodka while at A.P.'s home. Mother was dishonest with service providers for over a two-year period. Moreover, Mother's response to the violence to which she exposed her child, B.I., at A.P.'s house, was to enlist the assistance of D.A., a man against whom she had obtained a protective order.

13

A juvenile court must subordinate a parent's interests to those of the child. *In re J.S.*, 906 N.E.2d 226, 231 (Ind. Ct. App. 2009). The Child has been in relative foster placement for much of her life and has developed while in the foster placement. While we acknowledge and commend Mother for the progress she has made with regard to her grades and management of her schedule, we observe that the record reveals this change came about in knowledge of the imminent filing of a second petition to terminate her parental rights to the Child.

We will reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to the Child was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

Affirmed.

FRIEDLANDER, J., and BAILEY, J., concur.