CITY OF WHITING *v*. CITY OF EAST CHICAGO AND YOUNGSTOWN SHEET AND TUBE COMPANY.

[No. 676S169. Filed February 10, 1977.]

*Charles T. Clifford*, of Valparaiso, *John S. Grimes,* of Indianapolis, *Donald L. Gray*, of Whiting, for appellant.

*Lester F. Murphy*, of East Chicago, for appellees.

DeBruler, J.—This appeal arises from consolidated actions by appellees, Youngstown Sheet and Tube Company (Youngstown) and the City of East Chicago (East Chicago) against appellant City of Whiting (Whiting), concerning the corporate boundaries of Whiting and East Chicago. Youngstown operates a steel manufacturing plant on approximately 150 acres of land in Lake County, Indiana. This land was reclaimed by Youngstown by means of landfills beginning in 1948. Under Ind. Code §§ 4-18-13-1 to -3 (Burns 1974), Youngstown received title to this land by patent from the governor.

Prior to Youngstown's reclamation of the submerged land, the Lake Michigan shore ran from northwest to southeast through sections 9 and 16 of Township 37 North, Range 9 West of the Second Principal Meridian established by the United States Government rectangular survey in 1836. In 1896 and 1897, respectively, East Chicago and Whiting (then a town) annexed territory along the lake shore east and west, respectively, of the intersection of the shore with the boundary between sections 9 and 16 (section 9 is directly north of section 16, see Appendix).

Youngstown began conducting landfills from the shore in 1948, resulting in the extension of the shoreline outward in an irregular bulge through parts of sections 9 and 16; the filling progressed steadily until 1968. Youngstown began building the major buildings of its steel mill on the reclaimed

land in 1957, when construction of the seamless tube complex was begun.

Until 1968 it was apparently the impression of Youngstown, East Chicago, and Lake County, State, and Federal officials that the corporate boundary between Whiting and East Chicago was extended over the landfill along the north-south midline of section 9. This boundary was shown on maps prepared or used by the Lake County Commissioners, Surveyor, Auditor and Plan Commission; by the Indiana State Highway Commission; and by the United States Geological Survey. Such municipal services as the area east of the midline received were provided by East Chicago whose roads provided the only public access to the Youngstown plant. East Chicago issued building permits, monitored air pollution, and licensed contractors on the land. The area was included upon the zoning maps of East Chicago and excluded from the voting and zoning maps of Whiting. Finally, taxes on the real and personal property in the area were assessed on the assumption that it lay within East Chicago, which included the value of such property in its tax base, and issued bonds in reliance on the assumption that the property was available for taxation.

In 1968, Whiting's Common Council adopted Ordinance No. 1115, defining Whiting's corporate boundaries. Part of Youngstown's property (the disputed territory) was within the boundaries so defined. Youngstown and East Chicago filed separate actions to have Ordinance No. 1115 declared invalid and to restrain Whiting from annexing Youngstown's property. In 1970, while these actions were pending, Whiting adopted Ordinances No. 1123 and 1124, which respectively declared that the disputed territory was within Whiting, and purported to annex that territory.

In October of 1974, these cases were consolidated and tried without a jury. The trial court made findings of fact discussed below and made conclusions of law which substantially held that:

1. The Whiting-East Chicago boundary over the Youngstown landfill was uncertain.

2. The corporate boundary of Whiting does not extend ten miles into Lake Michigan to the state boundary, as claimed by Whiting Ordinances No. 1115, 1123, and 1124, and that those ordinances are void.

3. Whiting had acquiesced in the section 9 midline boundary for so long a time that such boundary would be deemed the true Whiting-East Chicago boundary.

4. The section 9 midline had become the Whiting-East Chicago boundary by "fixed practice" and the disputed land a "de facto" part of East Chicago.

5. Whiting had implicitly agreed to the section 9 midline boundary by performing acts recognizing it.

6. Whiting was estopped to deny that the section 9 midline was the Whiting-East Chicago boundary.

7. The extension of Whiting's boundaries to include the disputed property would deprive Youngstown of its property without compensation contrary to the Fifth Amendment.

8. Ordinances No. 1123 and 1124 were without effect.

9. The midline of section 9 constituted the Whiting-East Chicago boundary.

10. Annexation of the disputed territory by Whiting is not proper because the prerequisites for annexation are absent.

Whiting filed its motion to correct errors, containing 85 specifications of error. The motion attacked most of the trial court's findings as unsupported by sufficient evidence, all of the court's conclusions as erroneous, and the judgment as contrary to law. The motion to correct errors was overruled in its entirety. Whiting perfected its appeal to the Court of Appeals, and the appeal was transferred to this Court without decision by the Court of Appeals pursuant to Ind. R. Ap. P. 4(A) (10), because it involves "a substantial question of law of great public importance and that an emergency exists for a speedy determination."

Whiting asserts that the trial court's judgment is contrary to law insofar as it holds that:

1. Whiting's acquiescence in the section 9 midline boundary established that boundary between Whiting and East Chicago;

2. Whiting is estopped to claim that the disputed land is within its boundaries.

3. Whiting's 1970 annexation ordinance (No. 1124) is invalid. We believe that the trial court's "fixed practice" and "de facto part" conclusions are simply alternative phrasings of the acquiescence theory. The trial court's judgment will be affirmed if it was correct in holding the 1970 annexation invalid and either in holding that Whiting is estopped to claim the disputed territory or that Whiting's acquiescence established the midline boundary.

## I.

Whiting's position on the location of the Whiting-East Chicago boundary across the land reclaimed by Youngstown is that the boundary extended perpendicular to the general line of the pre-existing shore as the land was filled, by operation of law, and without the need for any action by Whiting. Whiting asserts that the judicial recognition of any other boundary amounts to a change in Whiting's territory which may only be effected by the Legislature.

The rules governing apportionment of land formed by natural accretion or artificial fill among adjacent riparian private landowners are diverse. Extension of the private boundary perpendicular to the shoreline is one of several methods mentioned by authorities as being used to effect an equitable division of the added land. 3 AMERICAN LAW OF PROPERTY § 15.31 at 866-67 (1952); 7 POWELL, REAL PROPERTY ¶ 986 at 618 (1976); BURBY, REAL PROPERTY § 19 at 52 (3d ed. 1965).[1]

---

1. A prominent alternative is to divide the land according to the relative proportions of "old" shoreline owned. 5A THOMPSON, REAL PROPERTY § 2560 at 602 (Grimes ed. 1957); POWELL, *supra*; 78 Am. Jur.2d *Waters* § 422 at 870 (1975).

It might be questioned whether municipal boundaries ought to automatically extend to include accreted or filled land. While our property law contemplates that *all* land be owned by *someone,* the law of municipal corporations does not similarly presume that all land lie within the boundaries of some municipality. Nonetheless, a general rule seems to have developed that municipal boundaries do extend automatically across filled or accreted land.

"If an individual has a right to extend his land by filling in and making improvements into the water and does so, the boundary of the municipality is extended in the same way, and to the same extent." 2 McQUILLIN, MUNICIPAL CORPORATIONS § 7.06 at 294-95 (1966).

See also RHYNE, MUNICIPAL LAW § 2-30 at 29-30 (1957).

In spite of the multiplicity of rules employed in extending ownership boundaries across accreted land, McQuillin asserts flatly that municipal boundaries extend perpendicular to the shoreline. 2 McQUILLIN, MUNICIPAL CORPORA-TIONS § 7.06 at 295 (1966). McQuillin cites *Fraser's Million Dollar Pier Co.* v. *Ocean Park Pier Co.,* (1921) 185 Cal. 464, 473, 197 P. 328, 331. It does not appear that many courts have considered the problem. Whiting in its argument assumes that all of the parties should have known, immediately as the land was filled, that the boundary was extending across the fill perpendicular to the shore. We believe that this is not an area in which the law is so settled that only one result is possible.

Whatever the result would have been if this Court were called upon to decide how municipal boundaries should be extended in general over reclaimed land, we find another principle applicable to this case which determines our decision. This is the principle of acquiescence in assumed boundaries. The United States Supreme Court has frequently applied this principle in boundary disputes between the states:

"The rule, long settled and never doubted by this court, is that long acquiescence by one state in the possession of territory by another and in the exercise of sovereignty and dominion over it is conclusive of the latter's title and rightful authority." *Michigan* v. *Wisconsin,* (1926) 270 U.S. 295, 308, 46 S.Ct. 290, 294, 70 L.Ed. 595.

See *Ohio* v. *Kentucky* (1973), 410 U.S. 641, 651, 93 S.Ct. 1178, 1184, 35 L.Ed.2d 560, and cases cited therein.[2]

A principle applicable to determine the boundaries of sovereign states should logically apply to those of municipal corporations, since both are governmental entities having territorial boundaries. McQuillin states that long acquiescence in the assumed location of a boundary supports the presumption that that location is correct. 2 McQUILLIN, MUNICIPAL CORPORATIONS, § 7.09 at 305-06 (1966). This principle has been recognized in other jurisdictions. *LaPorto* v. *Village of Philmont,* (1976) 39 N.Y.2d 7, 382 N.Y.S.2d 703, 346 N.E.2d 503; *Village of Elberta* v. *City of Frankfort,* (1956) 347 Mich. 173, 79 N.W.2d 616; *Thomas* v. *Parsley,* (1940) 283 Ky. 393, 141 S.W.2d 302; *City of Alameda* v. *City of Oakland,* (1926) 198 Cal. 566, 246 P. 69; *Starry* v. *Lake,* (1934) 135 Cal. App. 677, 28 P.2d 80.[3] The determination of whether the parties involved have acquiesced in the establishment of a boundary must be made from all of the circumstances of each case, for general rules could not provide for all possible cases. Factors tending to show acquiescence in this case would include the provision of municipal services to the claimed territory, exercise of police and regulatory powers over such territory, and assessment of taxes on the taxable property in such territory, by

2. The Supreme Court in *Michigan* v. *Wisconsin, supra,* recognized acquiescence as a rule of international law.

3. This Court suggested that acquiescence in purported municipal boundaries could cure defects in those boundaries in *Worley* v. *Harris,* (1882) 82 Ind. 493, 496:

"Besides, the territorial limits of the town may have been accurately defined by the user, or any inaccuracy in the survey and map of its territory may have been cured by the continued exercise of jurisdiction over its territories for a quarter of a century."

East Chicago, the municipality claiming by virtue of acquiescence, without protest or challenge by Whiting, the party contesting acquiescence. Affirmative acts by Whiting recognizing that the disputed territory lies within East Chicago or otherwise outside of Whiting would also tend to show acquiescence, as would any failure by Whiting to treat the disputed territory in the manner in which municipalities ordinarily treat territory included within them.

In this case the trial court found that all municipal services provided to the disputed territory since its creation were provided by East Chicago. These services included water, sewage treatment, police and fire protection, and ambulance service. East Chicago enforced its building permit, contractor licensing, pollution control laws, and criminal ordinances on the disputed land; Whiting never attempted to enforce any of its ordinances there. Taxes on real and personal property in the disputed area were assessed on the premise that the land lay in East Chicago; Whiting officials never included the value of such property in its budget. Whiting adopted ordinances defining voting and zoning districts which incorporated maps showing the disputed territory in East Chicago. All maps maintained by Whiting prior to the adoption of its 1968 ordinance show the boundary between Whiting and East Chicago to be the midline of section 9, placing the disputed land in East Chicago.

Although Whiting attacked most of the trial court's findings of fact as unsupported by the evidence in its motion to correct errors, Whiting has not favored this Court with any argument showing in what way the challenged findings are unsupported. Whiting has therefore waived any argument that the trial court's findings were not supported by sufficient evidence, for failure to comply with Ind. R. Ap. P. 8.3(A). *Foster* v. *State*, (1974) 262 Ind. 567, 320 N.E.2d 745. We are left with the proposition that the facts found by the trial court are insufficient, as a matter of law, to establish acquiescence in the section 9 midline boundary. We believe that the facts are sufficient to warrant application of the doctrine. The record

is barren of any attempt by Whiting, prior to 1968, to assert any claim to or exercise any authority over the disputed territory. Whiting silently permitted East Chicago to service and regulate the area for nearly twenty years, during which time both Youngstown and East Chicago came to rely on the belief that the area lay within East Chicago's boundaries. Although the time involved here is shorter than that in many of the reported decisions,[4] we believe that the facts of this case are sufficient to establish acquiescence by Whiting. Whiting stood silent for between ten and twenty years while Youngstown made expensive improvements (sewers and water mains) to receive East Chicago services, and while East Chicago borrowed money in reliance on tax revenue expected from Youngstown's property.

Whiting notes that territory in dispute is used entirely for industrial purposes; that municipal services provided to industrial facilities vary widely; and argues that absent any request for municipal services by Youngstown, Whiting's failure to provide such services does not amount to acquiescence in East Chicago's exercise of control over the disputed territory. Whiting further contends that holding otherwise allows Youngstown, as owner of land which by operation of law should be located in Whiting, to choose which city Youngstown's land will lie in, by requesting services from one city or the other. Such a holding would also allow East Chicago to claim land to which it is not otherwise entitled (under Whiting's view) by being the first city to extend municipal services to the newly formed land. Disputes between municipalities over their boundaries should not be resolved by races to reach disputed areas with municipal services.

If this were actually a case in which East Chicago had simply beaten Whiting in a race to provide services, we might

---

4. *LaPorto* v. *Philmont, supra* (45-80 years); *Elberta* v. *Frankfort, supra* (50 years); *Alameda* v. *Oakland, supra* (15-50 years); *Starry* v. *Lake, supra* (60 years); But c.f. *State ex rel. Landis* v. *Coral Gables,* (1935) 120 Fla. 492, 163 So. 308, 101 A.L.R. 578 (6-8 years sufficient).

agree with Whiting. But the trial court found that Whiting provided no services and exercised no control over the disputed land for a number of years, while Whiting had actual or constructive notice of East Chicago's claim from the numerous maps contained in public records showing the section 9 midline boundary. The trial court's findings clearly suggest that Whiting absolutely ignored the area for many years, not even exercising regulatory powers commonly applied to industrial facilities, such as zoning and construction licensing. We therefore cannot accept Whiting's argument.

Whiting's final argument as to this issue is that municipal corporations may not gain or lose territory except as provided by the Legislature or "by established legal principles." The application of the doctrine of acquiescence here is contended to transfer the disputed territory from Whiting to East Chicago without the authority of the Legislature. This contention is without merit; the Legislature has not declared the disputed territory to be either in Whiting or in East Chicago, and the establishment of boundaries by acquiescence is as well settled a legal principle as the "law of accretions" on which Whiting so heavily relies.

The trial court's judgment for Youngstown and East Chicago on the grounds of acquiescence in the section 9 boundary is not contrary to law. We therefore need not consider whether Whiting is estopped to claim the disputed Youngstown land.

## II.

Whiting also attacks the trial court's holding that the 1970 ordinances, including No. 1124, which sought to annex the disputed territory, were invalid. The trial court found that these ordinances were enacted to save Ordinance No. 1115 (the 1968 ordinance) from being invalidated by a change in state law in 1969.[5] The court held that this change did not affect the validity of Ordinance No. 1115, and that therefore

---

5. The City and Town Act of 1969, Ind. Code § 18-5-10 (Burns 1974) was passed, repealing prior annexation laws.

the 1970 ordinances were void. The court also found that the statutory prerequisites for annexation were not met.

Whiting argues on appeal that the 1970 ordinances were not at issue in this action, and that therefore the trial court erred in declaring them void. Although Whiting's motion to correct errors recited that the findings and conclusion were erroneous on their merits, Whiting does not argue this on appeal.

The trial court's pre-trial order states that this case is composed of four consolidated actions, two each by Youngstown and East Chicago against Whiting. All of the complaints were filed in 1968 and attacked Ordinance No. 1115. The record shows no further pleadings or amendments relating to the 1970 ordinances. However, at the pre-trial conference two stipulations proposed by Whiting were accepted by the parties. These stipulations read:

> "1. That the *ordinances which are the subject of this litigation* were passed and adopted by the defendant, City of Whiting.
>
> * * *
>
> 9. That the City of Whiting passed and adopted Ordinance No. 1123 and 1124 on January 1, 1970, copies of said Ordinances being attached as part of this pre-pre-trial [sic] offer to stipulate." (Emphasis added.)

Ordinance No. 1124 contained recitations describing the passage of Ordinance No. 1115 in 1968, the commencement of litigation challenging that ordinance, and Whiting's desire "to confirm its prior claim that the [disputed] landfilled area . . . is within the boundaries of the city of Whiting by operation of law. . . ."

We believe that the question before the trial court was whether the disputed territory was a part of Whiting, and that the 1970 ordinances were understood by the parties to be included in that question.

The quoted stipulations evidence such an understanding. In such circumstances the omission of the ordinances from

the pleadings does not exclude them from the issues of the case. Ind. R. Tr. P. 15 (B) provides.

> "When issues not raised by the pleadings are tried by express or implied consent of the parties, they [4] shall be treated in all respects as if they had been raised by the pleadings."

The validity of the 1970 Ordinances, No. 1123 and 1124, was a question properly before the court. That being the only challenge to the trial court's holding on those ordinances, we hold that the trial court did not err in its findings or conclusions relating to those ordinances.

Accordingly, the judgment of the trial court is affirmed.

Given, C.J., Hunter and Prentice, JJ., concur; Arterburn, J., not participating.

NOTE.—Reported at 359 N.E.2d 536.

24

APPENDIX

A BLOCK MAP OF
THE CITY OF
EAST CHICAGO
INDIANA
— SHOWING —
CITY BLOCKS, HOUSE NUMBER SYSTEM, LEADING INDUSTRIES, SCHOOLS, PARKS, PUBLIC BUILDINGS & RAILROADS
SCALE
DR. JOHN B. NICOSIA
MAYOR