**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Mar 11 2014, 10:16 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT (Mother):
**CRAIG C. PARKER**
Parker Law, LLC
Richmond, Indiana

ATTORNEY FOR APPELLANT (Father):
**J. CLAYTON MILLER**
Jordan Law, LLC
Richmond, Indiana

ATTORNEYS FOR APPELLEE:
**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**DAVID E. COREY**
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of B.P., C.P., and D.P., the minor children, and A.H., the Mother, and J.P., the Father: | ) ) ) ) | |
| A.H. and J.P., | ) ) | |
| Appellants-Respondents, | ) | No. 89A04-1310-JT-525 |
| vs. | ) ) ) | |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) ) ) | |

APPEAL FROM THE WAYNE SUPERIOR COURT
The Honorable Darrin M. Dolehanty, Judge
Cause Nos. 89D03-1306-JT-5, -6, and -7

**March 11, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

A.H. ("Mother") and J.P. ("Father") appeal from the involuntary termination of their parental rights to their children B.P., C.P., and D.P. In so doing, Mother and Father each contend that their due process rights were violated by the juvenile court's inclusion in its termination order findings of their lack of participation in services during their incarceration on pending criminal charges, and by finding and concluding that the Wayne County Department of Child Services ("WCDCS") had a satisfactory plan for the care and treatment of the children.

We affirm.

## FACTS AND PROCEDURAL HISTORY

The facts most favorable to the juvenile court's decision reveal that Mother and Father were the biological parents of C.P., born on February 22, 2008, D.P., born on April 23, 2009, and B.P., born on July 14, 2010. On February 5, 2012, Richmond Police Department Captain Neal VanMiddlesworth was sent to Mother and Father's home. While there, Captain VanMiddlesworth observed emergency medical technicians and other law enforcement officers present at the house, as well as other members of Mother's and Father's family. Mother, Father, and two or three other children were also present in the home. The EMTs were working with an infant later identified as K.H., Mother and Father's youngest child. The EMTs carried K.H., who was deceased, out of the home.

Captain Van Middlesworth testified that, had the children remained in the home, he would have contacted the local health department because of the condition of the home. He described the conditions in the home as deplorable and trashy. In particular, he observed used food containers, the odor of urine and feces, feces smeared on the wall, and

2

dirty diapers in view.

Almost contemporaneously with the report to law enforcement, the WCDCS received a report that the condition of Mother and Father's home was possibly unsafe. WCDCS received a second report pertaining to the family, this one involving K.H.'s death. As a result of this report, WCDCS family case manager Megan Beck ("FCM Beck") went to Reid Memorial Hospital where she observed K.H. FCM Beck described K.H. as deceased, small, pale, with sunken and loose skin. K.H.'s bones were prominent and portions of his skin had deteriorated. FCM Beck spoke with family members at the hospital and was told by Mother that K.H. had received regular medical care throughout his life and that it was typical for K.H. to be isolated in his bedroom for the entire day.

FCM Beck then visited with K.H.'s siblings, C.P., D.P. and B.P. who were in the care of relatives. FCM Beck observed that the children appeared clean and were dressed appropriately, but were small in size for their ages. FCM Beck then went to Mother and Father's home. There she observed fecal material smeared on the window, the wall, and in the carpet, a dirty diaper that was full, a plate, food wrappers and containers, and trash on the floors. The kitchen was cluttered and dirty, and piles of clutter, clothes, and other items were located throughout the home.

WCDCS filed a request to take the children into custody, which was granted on February 6, 2012. The children were taken into protective custody and the emergency custody order included findings that leaving the children in the home would be contrary to their welfare as their sibling, K.H., appeared to have died as a result of neglect and that the residence was not fit for human habitation. The emergency custody order was filed, and

3

child in need of services ("CHINS") proceedings instituted on behalf of the children. At the detention hearing, the juvenile court made the children temporary wards of WCDCS, and the foster placement which was already in place, was approved for continuation by the juvenile court.

At a placement hearing held in the three CHINS cases, the juvenile court rejected Mother's proposed placement of the children with a relative and entered an order for the continuation of the foster placement, which could not be changed without prior approval from the juvenile court. Amended CHINS petitions were filed with respect to each of the children, and a fact-finding hearing regarding those petitions was held on March 26, 2012. Several witnesses testified at the hearing including FCM Beck, a detective from the Richmond Police Department, and the pathologist who performed the autopsy on K.H. The three children were each adjudicated as CHINS, and the order contained findings supporting the adjudication, including but not limited to, the following: 1) that K.H. was born weighing eight pounds and seven ounces, but at the time of his death at approximately four months of age, he weighed six pounds and eight ounces; 2) the cause of K.H.'s death was dehydration due to starvation; 3) Mother and Father were incarcerated and charged with K.H.'s murder; 4) there was human or animal feces in the home with some spread on the walls of the home; and 5) the children had both speech and behavioral problems that had improved since their placement in foster care.

The juvenile court entered a dispositional order on April 20, 2012 granting wardship of the children to WCDCS and maintaining the children's placement in foster care. Mother and Father were ordered to notify the WCDCS case manager of any changes in address,

4

household composition, or contact information, and to execute the releases necessary for WCDCS to monitor Mother's and Father's compliance. Included in the juvenile court's periodic review hearing order entered on August 24, 2012, the parents were required to participate in parenting instruction and counseling made available to them in the course of their incarceration. The order also acknowledged that Mother and Father had not visited the children due to Mother's and Father's continued incarceration.

A permanency plan hearing was held on February 13, 2013. The juvenile court's order noted Mother and Father remained incarcerated and had been convicted of crimes involving the death of K.H. The order also acknowledged that Mother and Father had not participated in services due to their criminal charges and upon the advice of their respective attorneys. The juvenile court approved a permanency plan for each of the children involving the termination of Mother's and Father's parental rights and for adoption of the children. At a review hearing held on July 1, 2013, the juvenile court noted that Mother and Father remained incarcerated and that neither parent had visited with the children.

The WCDCS filed its termination petitions regarding each of the children on June 4, 2013. The evidentiary hearing on the termination petitions was held on September 26, 2013, at which both Mother and Father appeared in custody and represented by counsel. Although Mother's and Father's challenges to the juvenile court's order terminating their parental rights involve the findings that they failed to participate in services and that WCDCS had a satisfactory plan for the care and treatment of the children, we also set forth the balance of the evidence presented to and found by the juvenile court at the termination hearing.

On February 15, 2012, the State charged Mother and Father with murder and three counts of neglect of a dependent, each as a Class A felony. During Mother's trial the pathologist testified that, at the time of K.H.'s death, he was at the end of the state of malnutrition and that his body had deteriorated substantially. The pathologist opined that the process of malnutrition likely lasted approximately three months. At the conclusion of Mother's jury trial, she was convicted of the murder of K.H. and was subsequently sentenced to a term of sixty years executed in the Indiana Department of Correction with no time suspended. Mother pleaded guilty to three counts of neglect of a dependent, each as a Class D felony, pertaining to the children. The trial court sentenced Mother to three, concurrently-served, two-year sentences executed in the Indiana Department of Correction with no time suspended. The trial court's order reflected that those concurrent sentences would be served consecutively to Mother's sentence for murder.

Father's jury trial resulted in a verdict of guilty but mentally ill for reckless homicide on various counts. The trial court sentenced Father on his conviction of guilty but mentally ill for neglect of a dependent as a Class A felony to a term of thirty-seven years executed in the Indiana Department of Correction with no time suspended. Father pleaded guilty but mentally ill to three counts of neglect of a dependent, each as a Class D felony, with respect to the children. The trial court sentenced Father to three, concurrently-served, two-year sentences executed in the Indiana Department of Correction with no time suspended. The trial court's order reflected that those concurrent sentences were to be served consecutively to Father's previously-imposed, thirty-seven-year executed sentence.

Since the children's removal from the home, they were provided with significant

therapy. FCM Dana Burton was assigned to the children's cases. While assigned to the cases, FCM Burton had the children undergo a variety of assessments to determine the appropriate services to provide to each child. She saw the children daily for the first six months, then weekly, then every other week, as the children progressed.

When FCM Burton first met with the children on February 6, 2012, she observed that they were fussy, did not speak much, were screaming, and were upset. The children were also infested with lice. During frequent visits early on to the foster home, FCM Burton observed that the children would not speak, did not know each other's names, and did not know the names for common objects around them. D.P. was angry, frequently growled, and clenched his fists a lot. The children did not know how to play with toys and could not turn the pages of a book. On March 26, 2013, during her last visit with the children, FCM Burton noted that children did not exhibit any of that past behavior.

Since the children were removed from their home, Mother and Father have visited with them only once. WCDCS scheduled a visit with the children the day after their removal, but Mother and Father overslept and missed the visit. Mother and Father did attend the second visit that was scheduled on February 8, 2012. Mother and Father did not have any additional visitation with the children because they have remained incarcerated since February 13, 2012. Mother wrote to the children on a daily basis, but Father did not contact the children by letter or telephone.

The children resided with their foster mother, Melissa Todd, from the date of their removal through mid-September 2012, when they were placed in another foster home, where they have remained since. Todd had served as a foster parent for eight other children

7

prior to the children's placement with her. She noted that the children came to her looking pale and malnourished. For the first week of their placement with Todd, the children had a bad odor, were dirty, had digestive problems, and were infested with lice. The children did not seek each other's comfort and did not recognize any relationship with each other. The children spoke very little and referred to any food item as either pizza or a cookie. D.P.'s vocabulary consisted mostly of curse words. The children's eating habits were unusually unhealthy, and their sleeping patterns were disrupted with night terrors or other behavior indicative of a significant need for comfort. B.P. initially refused to be bathed, expressing terror of anything in the bathroom, but by the time she left Todd's care loved to take baths. C.P.'s digestive problems resolved after doctors successfully removed several impacted hair balls from his digestive system.

By the time the children left Todd's care they knew their own names and those of their siblings, they had relationships with each other, knew the names of body parts, and could use utensils to feed themselves. The children's behavioral clinician since early on in the course of their therapy, and who had worked with over two hundred families and many abused children, described the children as the neediest children with whom she had worked. Although she still works with the children, the volume of services she has provided the children has steadily decreased. CASA Director Karen Bowen worked with the children during the course of the CHINS cases. She described the children's progression from appearing to be haunted, to becoming beautiful and sparkly children.

After taking the matter under advisement at the conclusion of the termination hearing, the trial court entered its findings and orders terminating Mother's and Father's

8

parental rights to each of the children. Mother and Father both separately appeal the orders, but raise the same contentions.

## DISCUSSION AND DECISION

With respect to Mother's and Father's due-process-violation claims, our Supreme Court has recently stated the following with respect to the analysis:

> It is well established that the involuntary termination of parental rights is an extreme measure that is designed to be used as a last resort when all other reasonable efforts have failed. Choices about marriage, family life, and the upbringing of children are among associational rights the United States Supreme Court has ranked as of basic importance in our society and are rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect. "If any freedom not specifically mentioned in the Bill of Rights enjoys a 'preferred position' in the law it is most certainly the family."
>
> "The Due Process Clause of the U.S. Constitution and the Due Course of Law Clause of the Indiana Constitution prohibit state action that deprives a person of life, liberty, or property without a fair proceeding." Parental rights constitute an important interest warranting deference and protection, and a termination of that interest is a "unique kind of deprivation." However, children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships. When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process. The U.S. Supreme Court has written on the importance of heightened due process protections whenever the State wishes to sever the parental bonds of children:
>
>> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

9

Due Process has never been defined, but the phrase embodies a requirement of "fundamental fairness." The U.S. Supreme Court has written that "the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." The process due in a termination of parental rights proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. The balancing of these factors recognizes that although due process is not dependent on the underlying facts of the particular case, it is nevertheless "flexible and calls for such procedural protections as the particular situation demands." Finally, we must keep in mind the general principle that "if the State imparts a due process right, then it must give that right." A parent in a proceeding to terminate the parent-child relationship is statutorily entitled to (1) cross-examine witnesses, (2) obtain witnesses or tangible evidence by compulsory process, and (3) introduce evidence on behalf of the parent.

In balancing the three-prong *Mathews* test, we first note that the private interest affected by the proceeding is substantial-a parent's interest in the care, custody, and control of her child. We also note the countervailing *Mathews* factor, that the State's *parens patriae* interest in protecting the welfare of a child is also substantial. Both the State and the parent have substantial interests affected by the proceeding.

*In re C.G.*, 954 N.E.2d 910, 916-18 (Ind. 2011) (internal citations omitted).

Here, Mother and Father assert that the juvenile court deprived them of their due process rights because the court relied upon their invocation of their constitutional rights to silence under the Fifth Amendment and consequent failure to participate in services upon the advice of counsel as a justification to terminate their parental rights. They claim that they were forced to choose between their liberty and their future relationship with their children.

In the termination orders the juvenile court made two references to Mother's and Father's participation in services. In particular, paragraph 23 reads as follows:

Permanency Plan Hearing was held on February 13, 2013. The Parents were still in custody. The Order noted that the parents did not participate in

10

services, upon advice of counsel. The permanency plan for each was ordered as "termination of parental rights and adoption."

*Mother's App*. at 24. In paragraph (d) of the juvenile court's conclusions, the following appears:

> Neither parent engaged in any service offered by the [WCDCS], and there is no evidence to support a finding that the parents engaged in services on their own.

*Id*. at 26.

Also, in the termination proceeding, WCDCS admitted orders from the CHINS proceedings in which reference was made to Mother's and Father's participation in services. In the August 24, 2012 order, the juvenile court found that Mother and Father should participate in parenting instruction and counseling available to them during their incarceration. In the February 13, 2013 order, the juvenile court found that Mother and Father had not participated in services because of their pending criminal charges and upon the advice of their attorneys. In the July 1, 2013 order, the juvenile court found that Mother and Father had not been offered services at the request of their attorneys in their criminal cases and because of their incarceration. No objections were made to the admission of those exhibits at the termination hearing.

Mother and Father have arguably waived their constitutional claims because they are presenting them for the first time on appeal. *See Runkel v. Miami Cnty. Dep't of Child Servs.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) ("Issues not raised at the trial court are waived on appeal."); *Hite v Vanderburgh Cnty. Office of Family & Children*, 845 N.E.2d 175, 180 (Ind. Ct. App. 2006) ("It is well established that we may consider a party's constitutional claim waived when it is raised for the first time on appeal."). Nevertheless

we will address the merits of their claims.

Both parents cite to *Everhart v. Scott County Office of Family & Children*, 779 N.E.2d 1225 (Ind. Ct. App. 2002) in support of their arguments. In *Everhart*, the father was incarcerated pending charges of aggravated battery and neglect of a dependent relating to the child who was the subject of the petition for termination of parental rights. During the pendency of both cases, father participated in counseling sessions in which he discussed his own situation, but refused to discuss any events related to the child on the advice of counsel, invoking his Fifth Amendment right against self-incrimination. On appeal, after his parental rights were terminated, and he had pleaded guilty to the criminal charges, the father alleged that the DCS had violated his right to due process by offering him services while his criminal charges were pending, and then using his assertion of his right to silence as evidence that he had no interest in his children. We noted that the father's concern was that the information relayed to the social worker might be used in his criminal proceedings more than he was concerned about its use in the termination proceeding.

Finding no precedent to guide us in that particular context, we used the five-factor test set forth in *Bieghler v. State*, 481 N.E.2d 78, 92 (Ind. 1985), *cert. denied*, 475 U.S. 1031 (1986), to determine whether a violation of due process is harmless. We determined that the four of those five factors to be considered in a termination proceeding are: 1) the use to which the fact of the invocation of the right against self-incrimination is used; 2) who elected to pursue the line of questioning; 3) the amount of other evidence supporting the termination of parental rights; and, 4) the intensity and frequency of the reference. *Everhart*, 779 N.E.2d at 1231. Assuming a violation of the father's rights to due process,

we found that violation harmless in light of the amount of other evidence supporting the termination of his parental rights. *Id.* at 1231-32.

Turning to the present case, assuming *arguendo* that Mother's and Father's due process rights were violated, after applying the *Bieghler* test, we conclude that such violation was harmless in light of the overwhelming evidence supporting the termination of their parental rights to the children. The only reference to Mother's and Father's invocation of their right to remain silent was taken from the orders in the underlying CHINS proceedings, to which Mother and Father did not object. Counsel for the WCDCS attempted to ask FCM Beck about why Mother and Father did not participate in services, Father's counsel objected, and the juvenile court did not allow FCM Beck to testify about the reasons why Mother and Father did not participate in services. Additionally, counsel for DCS did not mention Mother's and Father's participation in services during closing arguments. The amount of evidence supporting the termination of Mother's and Father's parental rights is overwhelming such that we conclude that the violation of Mother's and Father's due process rights, if any, was harmless.

As for Mother's and Father's challenges to the sufficiency of the juvenile court's finding of a satisfactory plan for the children, we begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are

13

most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, in terminating Mother's and Father's parental rights, the juvenile court entered specific findings and conclusions in each of its orders. When a juvenile court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

   (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

   (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

   (iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)     that termination is in the best interests of the child; and

(D)     that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).  The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'"  *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2).  Moreover, if the juvenile court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a) (emphasis supplied).  At issue here is Mother's and Father's challenge to the sufficiency of the evidence that the WCDCS had a satisfactory plan for the care and treatment of the children.

We observe that Mother and Father have not challenged the juvenile court's findings of fact; thus, they stand as proven.  A party waives a challenge to the sufficiency of the evidence supporting the trial court's findings when the party does not provide any argument relating to the sufficiency of the findings of the trial court on appeal.  *City of Whiting v. City of E. Chicago*, 266 Ind. 12, 19, 359 N.E.2d 536, 540 (1977).  Even so, the record in this matter supports the juvenile court's findings.

Mother and Father argue that WCDCS was required to present more detailed evidence, i.e., present testimony from the pre-adoptive family or the identification of a specific, prospective adoptive family, to demonstrate its plan for the adoption of the children.  However, WCDCS bears no such burden.  We have stated that "[t]his plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated."  *In re D.D.*, 804 N.E.2d at 268.  "Attempting to find suitable parents to adopt the children is clearly a satisfactory plan."

*Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007). "The fact that there was not a specific family in place to adopt the children does not make the plan unsatisfactory." *Id.*

The juvenile court had before it the testimony of FCM Beck that the plan for the children was adoption. In September of 2012, the WCDCS identified a pre-adoptive home, and the children were transitioned from Todd's care to that pre-adoptive home, where they remained at the time of the hearing. CASA Bowen understood adoption was WCDCS's plan for the children in the event of the termination of Mother's and Father's parental rights. It was CASA Bowen's opinion that adoption was in the best interests of the children. We find no error in the juvenile court's finding.

We will reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record before us, we cannot say that the juvenile court's termination of Mother's and Father's parental rights to the children was clearly erroneous. We therefore affirm the juvenile court's judgment.

Affirmed.

FRIEDLANDER, J., and BAILEY, J., concur.