# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 11 2016, 6:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Gregg S. Theobald
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy's Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of:, | August 11, 2016 |
| | Court of Appeals Cause No. 79A02-1601-JT-57 |
| C.W. (Child), | |
| | Appeal from the Tippecanoe Superior Court |
| and, | |
| | The Honorable Faith A. Graham, Judge |
| Cl.W. (Father), | |
| | Trial Court Cause No. 79D03-1505-JT-42 |
| Appellant-Respondent, | |

v.

The Indiana Department of
Child Services,

*Appellee-Petitioner.*

**Barnes, Judge.**

# Case Summary

[1] Cl.W. ("Father") appeals the termination of his parental rights to C.W.[1] We affirm.

# Issue

[2] Father contends the evidence is not sufficient to support the termination of his parental rights.

# Facts

[3] C.W. was born on November 12, 2005, to Father and Mother. The three lived in Kansas City, Missouri. When C.W. was just two months old, Father and

---

[1] Mother's parental rights were also terminated. She does not appeal.

Mother separated; Father raised C.W. thereafter. In 2011, Father relocated to Tippecanoe County with C.W.

[4] In January 2014, Father was charged with molesting an eleven-year-old girl, whom he was babysitting, on four occasions. The victim alleged that during some of those instances, C.W. was asleep in the same bed during the molestations. Father pled guilty to Class C felony child molesting. The trial court sentenced him to six years in the Department of Correction with twenty-eight months executed. The trial court ordered Father to serve the balance of his sentence on supervised probation. Father was required to register as a sex offender. In April 2015, the trial court found Father violated the terms of his probation. At the time of final hearing in this matter, Father was serving his sentence on home detention through Community Corrections and was scheduled to remain on home detention for six more months; he had thirty-eight months remaining in his probation term.

[5] In March 2014, the trial court held a CHINS fact finding hearing and adjudicated C.W. to be a CHINS. DCS placed C.W. in foster care first with paternal relatives then with an unrelated foster family. Father initially denied any inappropriate contact with the victim. During a permanency hearing in April 2014, Father testified "he did not do anything" with regard to sexually inappropriate contact. Tr. p. 177. During his testimony in the termination hearing, Father acknowledged he "rubbed up against" the victim, but he denied "molesting" her and stated, "I didn't pull my pants down, I didn't pull her pants down, no contact . . . ." Tr. p. 164. He denied C.W. was sleeping in the

bed with the victim at the time and disputed the victim's allegation that during two of the incidents he "had [his] penis naked outside of [his] shorts . . . ." *Id.* at 165. Father denied any misconduct with regard to C.W.: "I didn't essentially do anything to my daughter . . . ." *Id.* at 204.

[6] C.W. has been diagnosed with acute post-traumatic stress disorder and has exhibited mild psychotic symptoms—"she was seeing things and hearing things and day dreaming." *Id.* at 26. "[C.W.] had a lot of trouble really identifying any adverse emotions that she had ever experienced, she denied any trauma." *Id.* Melanie Obremski, C.W.'s therapist, testified, "all of the symptoms that she is showing are characteristic of a child who has experienced some trauma and is just not able to process it and deal with it yet." *Id.* at 36.

[7] After Father was released from the Department of Correction, he requested parenting time with C.W. Obremski spoke with Father by telephone in order to provide the trial court with a recommendation regarding visitation. Based on that conversation with Father, Obremski opined that Father has a "lack of understanding or denial of the impact [] the abuse . . . has had on [C.W.]'s mental health . . . ." DCS Ex. 8. Obremski further stated that Father "does not accept any responsibility for his incarceration." *Id.* Obremski stated, "[Father] reports that by the time [C.W.] turns 18 or 20, she won[']t even be able to remember this incident at all maybe . . . [Father] denies that any abuse or wrongdoing has occurred." *Id.* Obremski reported, "During my phone conversation with [Father], he was given many opportunities to accept responsibility and/or ask questions about [C.W.], but instead boasted about

himself . . . ." *Id.* Obremski concluded, "In regards to ongoing visitation with [Father], this would set [C.W.]'s treatment back significantly and cause further psychological distress and behavioral concerns. [C.W.]'s dissociation and lack of ability to process or accept her trauma would likely increase, preventing progress in treatment." *Id.*

[8] On May 28, 2015, DCS filed a petition to terminate Father's parental rights. The trial court held an evidentiary hearing on September 21, 2015, and entered its order terminating Father's parental rights on December 21, 2015. Father now appeals.

## Analysis

[9] The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (citing *Pierce v. Soc'y of Sisters,* 268 U.S. 510, 534–35, 45 S. Ct. 571, 573 (1925), and *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S. Ct. 625, 626-27 (1923)). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054, 206 (2000)). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents . . . ." *Troxel*, 530 U.S. at 65, 120 S. Ct. at 2060 (citing *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S. Ct. 438, 442 (1944)). Parental interests, however, are not absolute and must be subordinated to the children's interests in determining the proper

disposition of a petition to terminate parental rights. *Bester*, 839 N.E.2d at 147. "[P]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." *Id.* (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004, *trans. denied*)).

[10]     Pursuant to Indiana Code Section 31-35-2-4-(b)(2), when DCS seeks to terminate the parent-child relationship of a child who has been adjudicated a CHINS, it must allege, in part:

> (B)     that one (1) of the following is true:
>
> > (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii)     The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)     that termination is in the best interests of the child; and
>
> (D)     that there is a satisfactory plan for the care and treatment of the child.

DCS must prove its allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992).

[11]     Our supreme court recently cautioned:

> [T]he "clear and convincing" evaluation is to be applied judiciously. "Reviewing whether the evidence 'clearly and convincingly' supports the findings, or the findings 'clearly and convincingly' support the judgment, is not a license to reweigh the evidence. Rather, it is akin to the 'reasonable doubt' standard's function in criminal sufficiency of the evidence appeals—in which we do not reweigh the evidence or assess the credibility of the witnesses, and consider only whether there is probative evidence from which a *reasonable jury could have* found the defendant guilty beyond a reasonable doubt . . . . Our review must give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand, and not set aside [its] findings or judgment unless clearly erroneous."

*In re N.G.* 51 N.E.3d 1167, 1170 (Ind. 2016) (quoting *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014)) (alterations in *N.G.*) (emphasis in *E.M.*) (citations omitted) (quotations omitted).

[12]     When, as here, a trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re D.K.*, 968 N.E.2d 792, 797 (Ind. Ct. App. 2012). "First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." *Id.* An appellant who does not cogently argue that the trial court's findings were not supported by sufficient evidence waives that argument on review, and we review only whether the facts found by the trial court are insufficient, as a

matter of law, to support a judgment. *See City of Whiting v. City of East Chicago*, 266 Ind. 12, 19, 359 N.E.2d 536, 540 (1977). "[W]here a party challenges only the judgment as contrary to law and does not challenge the special findings as unsupported by the evidence, we do not look to the evidence but only to the findings to determine whether they support the judgment." *Smith v. Miller Builders, Inc.*, 741 N.E.2d 731, 734 (Ind. Ct. App. 2000) (alteration in original).

[13]     Father contends generally that the trial court's legal conclusions that there is a reasonable probability the conditions that resulted in C.W.'s removal will not be remedied, there is a reasonable probability the continuation of the parent-child relationship poses a threat to C.W.'s well-being, that termination is in C.W.'s best interest, and that DCS has a satisfactory plan for C.W. are not supported by the findings of fact. Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS needed to prove only one of the requirements of subsection (B). We conclude there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child and, therefore, do not address whether there is a reasonable probability the conditions that resulted in C.W.'s removal will not be remedied. *See Bester*, 839 N.E.2d at 148 n.5.

### I. Continuation of the Parent-Child Relationship Poses a Threat to C.W.'s Well-Being

[14]     Father contends that the trial court's conclusion that continuation of the parent-child relationship is not supported by the findings of fact or by clear and convincing evidence. He also specifically challenges two findings of fact.

[15]  First, Father argues, "The trial court in Paragraph twenty (20) of its findings of fact [sic] that Father was diagnosed with impulse control disorder. This finding is not supported by the evidence." Appellant's Br. p. 17 (citation omitted). Father contends that finding is erroneously based on information from an intake assessment in which Father himself reported he has a history of impulsivity, not from an evaluation by a qualified mental health provider. Father challenges only a portion of Finding 20. The complete finding states:

> 20. During the intake assessment for sexually maladaptive behavior, Father reported being a victim of sexual abuse at the age of ten (10) or eleven (11) by a female babysitter. Father stated "I love myself" and "I am a non-violent individual". Father asserted that he wants to "move on" and is "[w]illing to do whatever it takes". Father was diagnosed with Impulse Control Disorder and began treatment.

App. p. 12. We note that, in addition to Father's self-reported struggles with impulse control, the "Primary Classification" section of what appears to be Father's Families United treatment plan states his Axis I diagnosis is "312.30 Impulse Control Disorder." DCS Ex. 11, p. 7. That document was signed by assessing therapist Kathi Lange, LCSW, LMFT, LCAC. The language Father challenges in this finding mirrors that used in the document signed by Lange. The evidence is thus sufficient to support the trial court's finding that Father has been diagnosed with Impulse Control Disorder.

[16]  Father next challenges a portion of Finding 23: "Father is unlikely to benefit from sex offender treatment and remains a risk to children, including his own."

Appellant's Br. p. 18. He contends, "the evidence presented at the termination [hearing] does not supporting [sic] this finding. The CASA testified that Father had never sexually abused his daughter." *Id.* To give context to Father's argument, we provide the complete finding:

> 23. Father asserts parental rights should not be terminated for "one mistake" and that he did not sexually abuse his daughter, Father does not acknowledge the extent of his sexually inappropriate actions and fails to comprehend the impact on both the victim and his own child. As such, Father is unlikely to benefit from sex offender treatment and remains a risk to children, including his own.

App. p. 12. We read this finding more generally with regard to C.W. than Father seems to. We understand the finding to mean not that Father necessarily is likely to directly sexually molest C.W. in the future,[2] but that, because Father continued to deny C.W. was present when he committed child molesting, he "does not acknowledge the extent of his sexually inappropriate actions and fails to comprehend the impact on . . . his own child" and C.W. thus remains at risk of being traumatized by Father. App. p. 10.

[17] At the time of the termination trial, Father continued to deny C.W. was present the four times he sexually molested an eleven-year-old girl. Father told Obremski, "by the time [C.W.] turns 18 or 20, she won[']t even be able to

---

[2] We note that the trial court found DCS received a report that C.W. "refused to discuss observations of her private parts being red and refused to let anyone touch her . . . [but] DCS offered no evidence regarding whether th[is] additional allegation[] [was] substantiated or even investigated." App. p. 10.

remember this incident at all maybe . . . ." DCS Ex. 8. Obremski recommended that Father not be permitted to visit with C.W. because visitation would not only "set back" her treatment but also "cause further psychological distress and behavioral concerns . . . [and] prevent[] progress in treatment." *Id.* The record contains ample evidence to support the trial court's finding.

[18] In addition to the two findings discussed above, the trial court found, in sum, that Father "minimized his actions" (with regard to his conviction for child molesting), denied he pulled the victim's pants down or removed his penis from his shorts, and denied C.W. was present in the room and/or bed with the victim during the molestations. Taken together, the trial court's findings support its conclusion that continuation of Father and C.W.'s parent-child relationship poses a threat to C.W.'s well-being.

## II. Best Interest

[19] Father next contends that the trial court's findings of fact do not support its conclusion that termination of the parent-child relationship is in C.W.'s best interest. He also argues, generally, that the trial court's findings of fact with regard to this element are not supported by the evidence. In determining what is in a child's best interest, the trial court is required to look at the totality of the evidence. *D.D.*, 804 N.E.2d at 267. In doing so, the trial court must subordinate the interests of the parents to those of the children involved. *Id.*

[20] Father does not challenge any specific findings of fact. Instead, he asks us to consider evidence that C.W. had "strong and positive bonds" with her Father,

grandmother, uncle, and nephews; that C.W. told her counselor, in sum, she wanted to live with her Father, grandmother, or other family members, and that she was sad she was not living with her family. Appellant's App. p. 20. Father also argues, "DCS did not present any independent studies of the long term impact and result to children whose parents have had their parental rights [] terminated by DCS in Tippecanoe County, the State of Indiana, or anywhere else in the United States." *Id.* at 21. Our standard of review in termination of parental rights cases is not a "license to reweigh the evidence." *N.G.* 51 N.E.3d at 1170, (quoting *E.M.*, 4 N.E.3d at 642) (alterations in *N.G.*) (emphasis in *E.M.*) (citations omitted) (quotations omitted). Instead, "Our review must give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand, and not set aside [its] findings or judgment unless clearly erroneous." *Id.*

[21]  Father does not direct us to any specific findings of fact that he contends are unsupported by the evidence. Thus, we will only consider whether the findings support the judgment. *See City of Whiting*, 266 Ind. at 19, 359 N.E.2d at 540.

[22]  The trial court found that the CASA observed improvements in a number of behaviors C.W. exhibited at the onset of the CHINS case: lying, stealing, and hoarding. The trial court found the CASA observed that C.W.'s primary behavioral issue now is "not getting along with or liking to share with others." App. p. 12. The trial court further found:

> At the onset of the CHINS case, [C.W.] was unable to identify
> any adverse emotions, even those associated with removal from

the home. [C.W.] had no good moral understanding of right from wrong. [C.W.] was knowledgeable of adult matters and made comments characteristic of adults rather than children. [C.W.] was also experiencing mild psychotic symptoms, both visual and auditory. As therapy progressed, the child began to identify emotions and symptoms improved. [C.W.] is coping well but will have long term therapeutic needs. [C.W.]'s therapist does not recommend contact with either parent in order to preserve progress and avoid disruption of treatment.

*Id.* at 13. Finally, the trial court found the CASA supported terminating Father's parental rights. These findings of fact are sufficient to support the trial court's conclusion that termination of Father's parental rights is in C.W.'s best interest.

### III. Satisfactory Plan

[23] Finally, Father argues that the trial court's conclusion DCS had a satisfactory plan for C.W.'s care and treatment is not supported by the findings and that the findings are not supported by the evidence. Again, Father fails to contend any specific findings of fact are unsupported by the evidence and, instead, asks this court to consider evidence favorable to his position. We cannot accept his invitation to invade the fact-finder's province and reweigh the evidence. In order for the trial court to terminate the parent-child relationship, the trial court must find that there is a satisfactory plan for the care and treatment of the child. *D.D.*, 804 N.E.2d at 268. This plan does not need to be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *Id.*

DCS's plan for C.W. is adoption. The trial court found "[C.W.] is bonded with the foster placement and is adoptable even if the concurrent [sic] foster placement is unable to adopt for any reason." App. p. 13. These findings are sufficient to support the trial court's conclusion that DCS has a satisfactory plan for the child.

## Conclusion

The trial court's termination of Father's parental rights to C.W. is not clearly erroneous. We affirm.

Affirmed.

Riley, J., and Bailey, J., concur.