# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 21 2017, 10:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Russell Dean Bailey
Demotte, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Marjorie Newell
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of:<br><br>A.S.C. & A.J.C.,<br><br>C.C.,<br><br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services,<br><br>*Appellee-Petitioner.* | March 21, 2017<br><br>Court of Appeals Case No. 37A03-1607-JT-1715<br><br>Appeal from the Jasper Circuit Court<br><br>The Honorable John D. Potter, Judge<br><br>Trial Court Cause No. 37C01-1603-JT-44 37C01-1603-JT-45 |

**Barnes, Judge.**

# Case Summary

[1] C.C. ("Mother") appeals the termination of her parental rights with regard to A.S.C. and A.J.C. ("the Children"). We affirm.

# Issue

[2] Mother contends the evidence was not sufficient to support the termination of her parental rights.

# Facts

[3] A.S.C. and A.J.C. are Mother's children. A.S.C. was born on August 8, 2014, and A.J.C. was born on January 4, 2013. On April 22, 2015, DCS filed a Child in Need of Services ("CHINS") petition alleging each child to be a CHINS. The trial court held a fact-finding hearing on that petition in July 2015 and adjudicated the Children to be CHINS. The trial court found:

> While in the care, custody, and control of the parents due to the parents being homeless and the mother using herion [sic]: 1) That on or about April 17, 2015, Family Case Manager Knoth ("FCM Knoth") went to the [sic] Lowell, Indiana where the parents and child were reported to be. FCM Knoth checked at area hotel parking lots, Brushwood Church, and Dollar General without being able to locate them. 2) That on or about April 20, 2015, FMC Knoth continued searching through relative contact and met with mother at the Jasper County Jail where she had been arrested on an unrelated matter. That mother admitted to have been staying [sic] at the Crisis Center, panhandling in Lowell, and being a heroin user. 3) That on or about April 22, 2015,

father and children were located in the Jasper County Courthouse employee parking lot and escorted back to the DCS office . . . . 5) That both mother and father have tested positive for heroin. 6) That the child[ren] need[] care, treatment, and rehabilitation that the parents are unwilling and/or unable to provide the child[re] without the coercive intervention of the court.

App. pp. 32 and 34.[1]

[4] DCS filed petitions to terminate Mother's parental rights, and the trial court held a fact-finding hearing on June 24, 2016. On June 30, 2016, the trial court issued findings of fact and conclusions thereon in orders terminating Mother's parental rights.[2] Mother now appeals.

# Analysis

[5] The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (citing *Pierce v. Soc'y of Sisters,* 268 U.S. 510, 534-535, 45 S. Ct. 571, 573 (1925), and *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S. Ct. 625, 626-27 (1923)). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054, 206 (2000)). "It is cardinal with us that the

---

[1] The trial court issued identical findings in separate orders pertaining to A.S.C. and A.J.C.

[2] The trial court issued separate, but identical, orders terminating Mother's rights with regard to each child.

custody, care and nurture of the child reside first in the parents . . . ." *Troxel*, 530 U.S. at 65, 120 S. Ct. at 2060 (citing *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 442 (1944)). Parental interests, however, are not absolute and must be subordinated to the children's interests in determining the proper disposition of a petition to terminate parental rights. *Bester*, 839 N.E.2d at 147. "[P]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." *Id.* (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004)).

[6]     Pursuant to Indiana Code Section 31-35-2-4(b)(2), when DCS seeks to terminate the parent-child relationship of children who have been adjudicated CHINS, it must allege, in part:

    (B)    that one (1) of the following is true:

        (i)     There is a reasonable probability that the
                conditions that resulted in the child's removal
                or the reasons for placement outside the
                home of the parents will not be remedied.

        (ii)    There is a reasonable probability that the
                continuation of the parent-child relationship
                poses a threat to the well-being of the child.

        (iii)   The child has, on two (2) separate occasions,
                been adjudicated a child in need of services;

    (C)    that termination is in the best interests of the child;
            and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove its allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992).

[7] Our supreme court recently cautioned:

> [T]he "clear and convincing" evaluation is to be applied judiciously. "Reviewing whether the evidence 'clearly and convincingly' supports the findings, or the findings 'clearly and convincingly' support the judgment, is not a license to reweigh the evidence. Rather, it is akin to the 'reasonable doubt' standard's function in criminal sufficiency of the evidence appeals—in which we do not reweigh the evidence or assess the credibility of the witnesses, and consider only whether there is probative evidence from which a *reasonable jury could have* found the defendant guilty beyond a reasonable doubt . . . . Our review must give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand, and not set aside [its] findings or judgment unless clearly erroneous."

*In re N.G.* 51 N.E.3d 1167, 1170 (Ind. 2016) (quoting *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014)) (alterations in *N.G.*) (emphasis in *E.M.*) (citations omitted) (quotations omitted).

[8] When, as here, a trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re D.K.*, 968 N.E.2d 792, 797 (Ind. Ct. App. 2012). "First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." *Id.* An appellant who does not cogently argue that the trial court's findings were not

supported by sufficient evidence waives that argument on review, and we review only whether the facts found by the trial court are insufficient, as a matter of law, to support a judgment. *See City of Whiting v. City of East Chicago*, 266 Ind. 12, 19, 359 N.E.2d 536, 540 (1977). "[W]here a party challenges only the judgment as contrary to law and does not challenge the special findings as unsupported by the evidence, we do not look to the evidence but only to the findings to determine whether they support the judgment." *Smith v. Miller Builders, Inc.*, 741 N.E.2d 731, 734 (Ind. Ct. App. 2000) (alteration in original).

## *I. The Conditions Resulting in Removal Will Not Be Remedied*

[9]     Mother contends there is not clear and convincing evidence to support the trial court's conclusion there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied and/or that the reasons for the children's placement outside Mother's home will not be remedied.[3] DCS removed the Children from Mother's care and placed them outside her home because the family was homeless and Mother was using heroin. DCS identified several areas in which Mother needed to improve: she needed stable housing, substance-abuse treatment, random drug screens, and supervised visitation with the Children.

---

[3] Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS needed to prove only one of the requirements of subsection (B). We conclude there is a reasonable probability that the conditions that resulted in the children's removal and the reasons for placement outside Mother's home will not be remedied.

[10] Consideration of whether the conditions will be remedied requires judging the parent's fitness at the time of the termination hearing, "taking into consideration evidence of changed conditions." *K.E. v. Indiana Dep't of Child Servs.*, 39 N.E.3d 641, 647 (Ind. 2015).

> Changed conditions are balanced against habitual patterns of conduct to determine whether there is a substantial probability of future neglect. Habitual conduct may include criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment, but the services offered to the parent and the parent's response to those services can also be evidence demonstrating that conditions will be remedied.

*Id.* (internal quotations omitted) (citations omitted).

[11] Mother challenges two of the trial court's findings of fact. Mother first contends the trial court's finding that she failed nineteen out of nineteen drug screens was incorrect. Instead, she asserts that she took twenty-three tests, four of which were negative, and that one of her positive tests "could be explained because she had a valid prescription for pain medication." Appellant's Br. p. 16. In support of that contention, Mother directs us to the progress report DCS family case manager Jody Knoth prepared for Mother's October 5, 2015 periodic review hearing.

[12] We acknowledge that document stated Mother participated in a total of thirty-five drug screens; four were negative; Mother failed to show up for an additional twenty drug screens; Mother tested positive for heroin, THC,

methamphetamine, amphetamine or some combination of those drugs in ten screens; and Mother tested positive, but had a valid prescription for oxycodone in one screen. *See* App. Vol. 2, p. 105. Those numbers are different from the ones cited by both the trial court's findings and Mother's Appellant's Brief. However, we note that DCS's exhibits 78 and 79 are the results of Mother's drug screens prepared by Forensic Fluids Laboratories and Redwood Toxicology Laboratory. Those exhibits contain a total of nineteen results, all of which were positive. In light of these exhibits, we conclude the evidence supports the trial court's finding with regard to Mother's drug screens.

[13] Mother next seems to challenge the trial court's finding that she did not make progress toward obtaining housing. She argues, "the record is devoid of any showing that the homes that Mother and Father lived at with relatives was [sic] an unsafe environment for the children or any reasons why it [sic] was unsuitable." Appellant's Br. p. 17. Mother does, however, acknowledge Knoth's testimony that she visited Mother while the family was living in a tent in Father's mother's garage and Knoth's opinion that the tent was not suitable housing.

[14] Christine Pirlot, a case worker with Family Focus, was assigned to help Mother find stable housing and employment. Pirlot testified that, between November 2015 and March 2016, Mother did not have stable housing. She testified, "They would stay, sometimes at the motel out by 65. Occasionally they would stay with his mom, and sometimes there was a house on Melville that they stayed at. And so, they were kind of moving between those three." Tr. Vol. II,

p. 35. Knoth testified she was unaware of any time during the pendency of this case when Mother had suitable housing available and that, "every time" she visited the grandmother's house, she was informed Mother was living in a tent in the garage. *Id.* at 78. Knoth testified she was "never notified they moved inside." *Id.* We conclude this evidence demonstrates Mother did not obtain "single family housing," which Knoth defined as "A house [or apartment] just for [Father], [Mother] and their children." *Id.* at 74. That evidence is sufficient to support the trial court's finding that Mother lacked stable, suitable housing.

[15] In addition to the findings with regard to Mother's continued substance abuse and homelessness, the trial court found that Mother was in and out of incarceration while this case was pending and was incarcerated at the time of the evidentiary hearing. The trial court found the only progress Mother made toward addressing her problem with substance abuse was that she was able to "vocalize" her substance abuse problem as the cause of her "issues." App. Vol. II, pp. 21 and 25. The trial court found Mother was not compliant or consistent in her participation in services.

[16] Our review of the evidence reveals that, in August 2015, Mother was referred to services at Dunebrook focused on educating her regarding "nurturing parenting techniques to foster emotional, intellectual and physical development for [her] children." Tr. p. 5. Mother was supposed to meet with her Dunebrook provider weekly, but between October 2015 and February 2016, she attended only four sessions. Dunebrook terminated its service in March 2016. "Due to

noncompliance of meeting weekly, there was no progression in the nurturing parenting curriculum that [Dunebrook] used." *Id.* at 10.

[17] DCS also referred Mother to Family Focus for assistance finding stable employment and housing, and Mother was scheduled to meet weekly with Pirlot. Pirlot testified that "on average," she saw Mother monthly. *Id*. at 33. Pirlot's monthly reports reveal she had difficulty contacting Mother. Pirlot also testified that Mother's only progress was that she was "able to verbalize that [she] had an addiction issue." *Id.* at 33. Mother did not obtain employment or stable housing; Mother was transient. Although Mother never provided Pirlot with any documentation regarding her medical problems, Pirlot acknowledged Mother had numerous health issues that made it more difficult for her to find employment. In lieu of employment, Pirlot encouraged Mother to apply for Social Security Disability.

[18] Family Focus also provided addictions counseling for Mother. Social worker Paul Hannon attempted to contact Mother every week from August 2015 to January 2016. Hannon scheduled an initial meeting with Mother in late September 2015, but Mother did not show up. Mother's first, and, ultimately, last appointment with Hannon was in December 2015. Mother had an appointment scheduled for January 2016, but she cancelled it. Hannon testified Mother was not willing to participate in addictions counseling and did not make progress in the service because of her lack of participation.

[19] Finally, Knoth testified that, while this case was pending, Mother was charged with criminal offenses on several occasions. In April 2015, she was charged with driving with a suspended license; in August 2015, she was charged with possessing a narcotic and with unlawfully possessing a syringe; and in June 2016, Mother was alleged to have violated the terms of her probation by testing positive for heroin.

[20] We conclude this evidence establishes a clear pattern of Mother's continued struggle with substance abuse and homelessness. *See K.E.*, 39 N.E.3d at 647. This evidence of habitual conduct is sufficient to conclude there is a substantial probability of future neglect. *See id.* The trial court's conclusion that there was a reasonable probability that the conditions resulting in removal will not be remedied was not clearly erroneous.

## II. Best Interests

[21] Mother contends, generally, that DCS did not demonstrate by clear and convincing evidence that termination of the parent-child relationship is in the Children's best interests. In determining what is in the best interests of the children, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d at 267. In doing so, the trial court must subordinate the interests of the parents to those of the children involved. *Id.*

[22] The trial court found that the Children have bonded with their prospective adoptive parents and that Mother is unable to provide them with permanency. Our review of the evidence reveals that, although the Children appear to be well

adjusted and are in good physical and psychological shape, they need permanence that Mother is clearly unable to provide. Further, it does not appear Mother is any closer to being able to provide that permanence than she was when this case began. The trial court's conclusion that termination of Mother's parental rights is in the Children's best interests is not clearly erroneous. [4]

## Conclusion

The trial court's termination of Mother's parental rights with regard to the Children is not clearly erroneous. We affirm.

Affirmed.

Kirsch, J., and Robb, J., concur.

---

[4] Mother does not challenge the trial court's conclusion that DCS has a satisfactory plan for the Children's care.